```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                     HOUSTON DIVISION


KEVIN JIMERSON,                    §
                                   §
     Plaintiff,                    §
                                   §
v.                                 §   CIVIL ACTION NO. H-09-0790
                                   §
GARRETT AVIATION SERVICES, LLC,    §
                                   §
     Defendant.                    §
```

MEMORANDUM AND ORDER

Pending is Defendant Garrett Aviation Services, LLC's Motion for Summary Judgment (Document No. 36). After careful consideration of the motion, response, reply, and the applicable law, the Court concludes that the motion should be granted.

I. Background

Plaintiff Kevin Jimerson ("Plaintiff") alleges race discrimination by his employer, Defendant Garrett Aviation Services, LLC ("Defendant"), asserting claims for hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Plaintiff began working for Defendant as an Non-Destructive Testing ("NDT") Inspector in Defendant's Augusta Georgia facility in August of 2004.[1] In 2006, he was promoted to Senior NDT Inspector and transferred to

---

[1] Document No. 1 at 3 (Plaintiff's Original Complaint).

Defendant's Houston, Texas facility at George Bush International Airport, where he performed highly-specialized testing on aircrafts to ascertain their airworthiness.[2]  On June 8, 2007, Plaintiff without calling his supervisor prior to the start of his shift, failed to show up for work.  His supervisor called him, and Plaintiff had overslept.  Plaintiff was given a verbal warning for violating Defendant's attendance policy.[3]

Plaintiff ordinarily worked the morning shift, but on March 4, 2008, he was called into work at 10:30 p.m. to perform an emergency inspection on a customer's plane.[4]  After he performed the inspection, a customer service representative insisted that Plaintiff not go home until after the engineers could look at the results of the inspection. During that wait time, Plaintiff joined a group of workers who were standing around conversing.  Plaintiff noticed a nylon rope that allegedly resembled a noose hanging from the rafters.[5]  Plaintiff asked "no one in particular, 'what the hell is this rope for?'" and one of the group, Mike Houlihan, the customer service representative, said that it was to wrap around

---

[2] Document No. 38 at 2.

[3] Document No. 36 at 6; Document No. 37, exs. 12 & 13, ¶¶7-8.

[4] Document No. 36 at 6.

[5] Id.  Defendant is an aircraft services provider, and its hangar has many such lanyards hanging from the ceiling that serve as safety harnesses.  See Document No. 36 at 4.

2

Plaintiff's neck.[6]  Plaintiff claims that he felt afraid for his life over the incident and "felt a chill go down [his] spine."[7] Nonetheless, Plaintiff in those early morning hours later entered into Houlihan's office, where the same group of men watched a lewd video on Houlihan's computer.[8]  Houlihan "finally checked his e-mail for the engineers' response and allowed [Plaintiff] to go home" about 2:45 a.m.[9]

On his next day at work, March 6, 2008, Plaintiff reported Houlihan's comment and the lewd video incident to his supervisor and to the Human Resources Manager.[10]  Plaintiff also initiated the company's Dispute Resolution Program ("DRP") by submitting a Level One form that same day.[11]  Plaintiff received a written acknowledgment of his complaint from Human Resources four days later.[12]  In addition to Human Resources' investigation, Defendant hired a neutral ombudsman, Sandra Smith, to conduct an independent investigation.[13]  She found no evidence to substantiate the noose

---

[6] Document No. 38, ex. 2 at 3 (EEOC Charge).

[7] Id.

[8] Document No. 36 at 5; Document No. 1 at 7.

[9] Document No. 38, ex. 2 at 3.

[10] Id.

[11] Id.

[12] Id. at 8.

[13] Document No. 36 at 5.

incident, but did find supporting evidence regarding the pornographic video.[14] Similarly, Human Resources' investigation did not uncover evidence to substantiate the noose incident and, after Plaintiff asked Human Resources for the findings of its investigation, they were furnished to him on April 22, 2008.[15]

Meanwhile, within a week after making his complaint to Human Resources on March 6th, Plaintiff had also filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which instructed Plaintiff to follow Defendant's Dispute Resolution Program's guidelines.[16] After Defendant concluded its DRP process, Plaintiff reurged his EEOC complaint and was assigned an EEOC charge number on May 14, 2008.[17]

On July 1, 2008, and again on November 7, 2008, Plaintiff missed work without calling in prior to the start of his shift. These were his second and third violations of Defendant's attendance policy.[18] He received a verbal warning for his second violation, and a 3-day suspension following the November violation.[19] Plaintiff refused to sign his suspension letter,

---

[14] Document No. 1 at 8.

[15] Id.

[16] Id.; see Document No. 38, ex. 2.

[17] Document No. 38, ex. 2 at 3.

[18] Document No. 36 at 6-7.

[19] Id.

however, objecting to alleged inaccuracies in the report.[20]  On November 18, 2008, the Human Resources Director asked to see Plaintiff in Plaintiff's supervisor's office.[21]  Plaintiff refused to go to the supervisor's glassed-in office "to be put on display," and instead asked that they talk to him in a conference room without windows.[22]  He was terminated that day.[23]

In his Original Complaint, Plaintiff alleges: (1) violations of Title VII and 42 U.S.C. § 1981 (discrimination and retaliation); (2) disparate treatment; (3) intentional infliction of emotional distress; (4) negligent hiring; (5) negligent supervision; (6) negligent retention; and (7) diminished earning capacity.

Defendant moves for summary judgment, asserting that: (1) Defendant terminated Plaintiff for a legitimate, non-discriminatory reason, that is, for his violations of Defendant's attendance policy; (2) Plaintiff cannot show pretext or create a fact issue on his ultimate burden of proving intentional discrimination; (3) Plaintiff cannot prove that Defendant knew of the alleged harassment and failed to take prompt remedial action; (4) there was no disparate treatment or retaliation;

---

[20] Id.

[21] Document No. 1 at 10.

[22] Id.

[23] Id.

(5) Plaintiff's claims for negligent hiring, supervision, and retention fail because he cannot prove that any of the employees were unfit or incompetent; and (6) Plaintiff's claim for intentional infliction of emotional distress lacks evidence to establish outrageous conduct.[24]

Plaintiff does not oppose summary judgment dismissing his claims for negligent hiring, negligent supervising, negligent retention, disparate treatment, intentional infliction of emotional distress, and diminished earning capacity,[25] but argues that he has raised fact issues on his remaining claims of hostile work environment and retaliation.[26]

## II.  Standards of Review

### A.  Summary Judgment Standard

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party must

---

[24] Document No. 36 at 8-17.

[25] Document No. 38 at 1.

[26] Id.

"demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule

7

56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

### B. Race Discrimination Burden Shifting Framework

Title 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Title VII of the Civil Rights Act of 1964 and § 1981 are substantively identical in the context of racial discrimination. Jones v. Robinson Prop. Group, L.P., 427 F.3d 987, 992 (5th Cir. 2005). Under Title VII, a plaintiff alleging that his employer has discriminated against him must either offer direct evidence supporting his claim or use the indirect method of proof set forth in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817, 1824 (1973). Claims of intentional discrimination under § 1981 require the same kind of proof. *See* Raggs v. Miss. Power & Light Co., 278 F.3d 463, 468 (5th Cir. 2002). Thus, if a Plaintiff presents no direct evidence of discrimination to survive summary judgment he must utilize the McDonnell Douglas method.

The McDonnell Douglas method places the initial burden on the Plaintiff to establish a *prima facie* case. 93 S. Ct. at 1824. Once Plaintiff meets this initial burden, the burden then shifts to

the employer to articulate a legitimate, non-discriminatory reason for its actions. *See* Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2106 (2000). The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'" Id. (quoting St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2748 (1993)). If the employer sustains its burden, the burden shifts back to the plaintiff to establish that the employer's given proffered reason is merely a pretext for discrimination. *See* Davis v. Dallas Area Rapid Transit, 383 F.3d 309, 317 (5th Cir. 2004).

### III. Discussion

#### A. Hostile Work Environment

To establish a hostile work environment claim, Plaintiff must show: (1) he is a member of a protected group; (2) he was a victim of harassment; (3) the harassment was based on race; (4) the harassment affected a "term, condition, or privilege" of Plaintiff's employment; and (5) Defendant knew or should have known of the harassment and failed to take prompt remedial action. Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002). Defendant contends that Plaintiff cannot establish that (1) he was subjected to race-based harassment that affected a "term, condition, or privilege" of employment, or (2) that Defendant knew or should have

9

known of the harassment but failed to take prompt remedial measures.

For race-based harassment to affect a "term, condition, or privilege" of employment, as required to support a claim for hostile work environment under Title VII, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 114 S. Ct. 367, 370 (1993), *abrogated on other grounds by* Burlington Ind., Inc. v. Ellerth, 118 S. Ct. 2257 (1998). Courts look to the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 371.

Here, the alleged incident of racism was an isolated one-time event. It was prompted by Plaintiff's question, "What the hell is this rope for?", which Plaintiff testified he asked of no one in particular while he and the other men in the middle of the night waited for a report from the engineers. The uncontroverted facts are that when Houlihan uttered his reply, no one touched or approached Plaintiff in a threatening manner and there was nothing else said about the rope. Plaintiff admits that no one ever referred to the rope as a "noose."[27] In fact, the rope itself was

---

[27] Document No. 37, ex. 1 at 163:18-19.

a commonplace fixture in the workplace that Plaintiff saw every day--several lanyards hang from the ceiling and are used to attach to safety harnesses. Plaintiff was familiar with the ropes and testified that he used them on occasion when he had to perform work more than four feet off the ground.[28] Houlihan's spontaneous reply to Plaintiff's aimless question--certainly in the context of a white man speaking to a black man--was offensive and ill mannered, but this isolated incident is not the kind of proof required to establish a claim of a racially hostile work environment. *See* Drummond v. Stone, No. 91-2719, 1993 WL 17607, *4 (E.D. La. Jan. 19, 1993) (holding that a single incident of placing a noose on a pay phone was insufficient, by itself, to give rise to a claim of a racially hostile work environment). Indeed, Houlihan's offensive reply to Plaintiff's senseless question is far short of what the proof showed in Bell v. Ingalls Shipbuilding Inc., 207 F.3d 657, No. 98-60353, 2000 WL 122384, *1 (5th Cir. Jan. 4, 2000), where there was a "frequent making of nooses, coupled with the presence of allegedly offensive racial remarks and the presence of KKK graffiti at the worksite." That kind of frequent and offensive conduct did "raise an issue regarding whether the work atmosphere . . . was racially hostile." Id.

---

[28] Id. at 114:3-24.

Moreover, Plaintiff did not act as if he were subjectively threatened after hearing Houlihan's reply. He did not flee, seek help, or hold himself apart from others. To the contrary, he voluntarily entered Houlihan's office where Houlihan and the other men watched a pornographic video while continuing to wait for the report from the engineers. Also, Plaintiff conceded in his deposition that the incident did not affect his work performance.[29] *See* Harris, 114 S. Ct. at 371 (holding that effect on work performance is a factor to consider in assessing a hostile work environment claim). Taken as a whole and in a light most favorable to Plaintiff, the incident in this case was not sufficiently severe to create a hostile work environment.

In addition, when Defendant received Plaintiff's complaint, it promptly responded by initiating an independent investigation. Plaintiff was informed of the investigation. Defendant hired a neutral ombudsman, who interviewed all the co-workers who were present that night.[30] The investigation was completed within six weeks, and the neutral investigator found that the allegations

---

[29] Id. at 328:14-19.

[30] Plaintiff challenges the adequacy of the investigation because the customer whose plane was being worked on that night was not interviewed as part of Defendant's internal inquiry, regarding its own employees' conduct in the workplace. Plaintiff has presented no summary judgment evidence, however, that the customer present that night had any different recollection of the events than that of those who were interviewed.

about the noose incident lacked substance. Notably, Plaintiff admits that no other instances of racial harassment occurred after Plaintiff made his initial report apprising Defendant of a problem.[31] Thus, for the additional reason that Defendant took prompt action to respond to the complaint of offensive conduct, which then never recurred, Plaintiff has failed to raise a genuine issue of material fact as to his hostile work environment claim.

B. <u>Termination Based on Retaliation</u>

Plaintiff presents no direct evidence of retaliation and therefore must proceed under the <u>McDonnell Douglas</u> burden-shifting scheme. *See* <u>Septimus v. Univ. of Hous.</u>, 399 F.3d 601, 609 (5th Cir. 2005). To make a *prima facie* case of retaliation, Plaintiff must show: (1) that he engaged in a protected activity; (2) that an adverse employment action occurred, such as termination; and (3) that a causal link existed between the protected activity and the adverse action. *See* <u>Septimus</u>, 399 F.3d at 610; <u>Davis</u>, 383 F.3d at 319.

---

[31] Document No. 37, ex. 1 at 336:5-15. Although not argued in opposing summary judgment, Plaintiff also complained that a co-worker one time had called him a "hambone." Plaintiff does not explain why this term should have any racial connotation at all, but if it does, it is wholly insufficient to give rise to an actionable claim of race discrimination. *See* <u>Alaniz v. Zamora-Quezada</u>, 591 F.3d 761, 771 (5th Cir. 2009) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not generally not affect a "term, condition, or privilege of employment.").

13

Plaintiff proffers no competent summary judgment evidence of a causal connection, and therefore the Court is left with only the timing of the events as potential evidence.[32] *See* <u>Swanson v. Gen. Servs. Admin.</u>, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation."); *see also* <u>Bregon v. Autonation USA Corp.</u>, 128 F. App'x 358, 361 (5th Cir. 2005) (plaintiff established causal link where he "was fired only a week after he filed his complaint and he offered evidence that people at

---

[32] Defendant's decision to terminate Plaintiff after three incidents of absenteeism does not contradict Defendant's policy manual, as Plaintiff maintains. Plaintiff's argument that Defendant "skipped a step" in its disciplinary procedures when it fired Plaintiff fails because Defendant's decision to terminate Plaintiff was well within the company's Corrective Action policy, which expressly states that "the company reserves the right to impose whatever action it deems appropriate under the gravity of the offense and in light of all the facts and circumstances without regard to sequence or number of steps." *See* Document No. 38, ex. 10 (Corrective Action Policy). Also, to show pretext, Plaintiff alleges that the Human Resources Vice President asked the Human Resources Manager to keep her apprised of any disciplinary actions against Plaintiff. However, a close examination of the Vice President's actual testimony shows that Plaintiff misstates what she said. *See* Document No.38, ex. 3 at 142:2-143:11 (Grande Depo.). The Vice President testified that the Human Resources Manager kept her apprised of what was going on in the case, not that she had specifically asked him to inform her any time that there was a disciplinary action taken against Plaintiff. Moreover, the Vice President testified that the Human Resources Manager regularly kept her apprised of disciplinary actions against other employees, stating "he probably [informed me about disciplinary events] most times, yes." <u>Id.</u> at 143:15-21. Plaintiff presents no evidence that he was treated differently than white workers under similar circumstances. <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 562 (5th Cir. 2007).

work were likely aware of his complaint."). Here, six months elapsed between Plaintiff's complaint with the EEOC and his termination. Also, Plaintiff's termination occurred more than eight months after Plaintiff's initial complaint with the company. This is longer than the broadest range recognized in the temporal proximity cases. *See, e.g.*, Evans v. City of Hous., 246 F.3d 344, 354 (5th Cir. 2001) (finding a *prima facie* case when plaintiff was fired five days after complaint filed); Swanson, 110 F.3d at 1188 (one day); Bregon, 128 F. App'x at 361 (one week); United States v. Matagorda Cnty, Tex., 181 F. Supp. 2d 673, 682 (S.D. Tex. 2002) (two days); *see also* Handzlik v. United States, 93 F. App'x 15, 19 (5th Cir. 2004) (two months); *cf.* Strong v. Univ. HealthCare Sys., 482 F.3d 802, 808 (5th Cir. 2007) (affirming summary judgment for employer on retaliation claim where employee was terminated three and one-half months after making complaint); Russell v. Univ. of Tex., 234 F. App'x 195, 206 (5th Cir. 2007) ("Numerous courts have held that temporal proximity evidence alone cannot support an inference of causation when there is a four-month gap between the protected activity and the adverse employment action."). In sum, Plaintiff's termination six or eight months after he alleged racial harassment and filed an EEOC complaint was too distant in time for the Court to infer retaliation on timing alone.

Plaintiff has failed to rebut Defendant's non-discriminatory reason for his termination, namely his multiple violations of the employer's attendance policy. *See* McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007) (an employer's legitimate, nondiscriminatory reason for termination rebuts a *prima facie* showing of retaliation). Even when asked in his deposition why he "believe[d]" that he lost his job, Plaintiff responded: "Because--because of my attendance. I mean, that's what I was told."[33] *See* Brooks v. Lubbock Cnty Hosp. Dist., 373 F. App'x 434, 437-38 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 228 (2010) (finding no pretext where plaintiff did not dispute that he was terminated for a legitimate reason and offered little or no evidence that employer's stated reason for termination was false); *see also* Roberson v. Alltel Info. Services, 373 F.3d 647, 656 (5th Cir. 2004) ("Without more than timing allegations, and based on [the employer's] legitimate, nondiscriminatory reason in this case, summary judgment in the favor of [the employer] was proper."). Plaintiff has not raised a genuine issue of material fact to support his retaliation claim, and Defendant is therefore entitled to summary judgment.

---

[33] Document No. 37, ex. 1 at 276:3-5.

IV.  Order

For the foregoing reasons, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 36) is GRANTED, and Plaintiff's claims will be DISMISSED on the merits.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 6th day of December, 2010.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE